UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

TTT FOODS HOLDING COMPANY LLC,
a Florida limited liability company,
                    Plaintiff,

v.                                          Case No.: 9:16-cv-81798-DMM

BEATRICE NAMM, an individual,
JONATHAN NAMM, an individual, and
DELUXE GOURMET SPECIALTIES LLC,
a New Jersey limited liability company,
                    Defendants.
_____/

**AFFIDAVIT IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

STATE OF FLORIDA
COUNTY OF ORANGE

        BEFORE ME, the undersigned authority, personally appeared BEATRICE NAMM,

known to me to be the person described herein, who, after being duly sworn, does state as

follows:

        1.      I am over the age of 21 and all statements made herein are based on my

personal knowledge.

        2.      I developed some unique formulae and recipes for spaghetti and barbecue

sauces, and salsas ("Recipes").

        3.      Starting in 2006, without any prior business experience, I started to

produce and sell spaghetti and barbecue sauces, and salsas, out of my home in New Jersey.

        4.      I eventually organized Defendant DELUXE GOURMET SPECIALTIES

LLC, a New Jersey limited liability company ("Deluxe"), and started doing the sauces and salsa

business through Deluxe.

5.      I am the sole manager and member of Deluxe.

6.      The Recipes were assets of Deluxe until they were transferred to the Judgment Debtor pursuant to the Asset Purchase Agreement on or about December of 2012.

7.      The Recipes were very successful and have significant value.

8.      In 2012, when the Recipes were transferred to the Judgment Debtor, Plaintiff TTT FOODS HOLDING COMPANY LLC, a Florida limited liability company ("Plaintiff"), paid me the sum $300,000.00 for 49% of the assets of Deluxe, the biggest asset of Deluxe being the Recipes.

9.      When Plaintiff sold its 49% ownership interest back to the Judgment Debtor in March of 2015, I, on behalf of the Judgment Debtor, agreed to pay Plaintiff the sum of $320,000.01, recognizing the significant value of the assets of Judgment Debtor; the most valuable of the assets being the Recipes.

10.     The Recipes have value today.

11.     The Recipes have had value at all times since March 15, 2015.

12.     The Recipes are assets of the Judgment Debtor.

13.     I believe the Recipes have a value of over $400,000.00 today.

14.     I believe that the value of the Recipes, at all times since March 2015, was well over the debt owed to Plaintiff.

15.     The Recipes are still available to Plaintiff and have value which exceeds the remaining debts of the Judgment Debtor.

16.     Neither I nor the Judgment Debtor have transferred to anyone any of the Recipes.

17.     There is no question that the Judgment Debtor is not now, nor as it ever

been, insolvent.

18.     Judgment Debtor was not insolvent on March 2015, nor at any other time when any of the transfers that form the subject matter of this lawsuit were made, nor is it insolvent today.

19.     The assets of Judgment Debtor exceed the amount of all the debts of Judgment Debtor, and that fact was true on March of 2015, it was true from March 2015 to June of 2016, and is still true today.

20.     I disagree with William G. King's report and conclusion that the Judgment Debtor was insolvent at any time when any of the transfers that Plaintiff is alluding to in his undisputed facts statement submitted to the Court.

21.     JMT Food Group LLC, a Florida limited liability company ("JMT"), as nothing to do with Deluxe or the Judgment Creditor.

22.     On January 15, 2015, I organized JMT to manufacture and distribute hummus, a totally distinct product from the Recipes and the barbecue sauces and pastas and salsas that Judgment Debtor sold, and totally unrelated to the Judgment Debtor.

23.     Generally speaking, hummus is a Levantine dip or spread made from cooked, mashed chickpeas or other beans, blended with tahini, olive oil, lemon juice, salt and garlic.

24.     Hummus is not a spaghetti or barbecue sauce or a salsa.

25.     JMT has never been in the business of manufacturing or distributing spaghetti or barbecue sauces, or salsa.

26.     Neither Deluxe nor Judgment Debtor were ever in the business of manufacturing or distributing hummus.

27.     Plaintiff was organized on December 11, 2012, by Donald K. Porges.

28.     Donald K. Porges was designated as the sole manager of Plaintiff, and as consistently been the sole manager of Plaintiff.

29.     Donald K. Porges is, and was at all times material hereto, a practicing certified public accountant with his own CPA firm.

30.     Donald K. Porges organized Bea's Brooklyn's Best LLC, a Florida limited liability company ("Judgment Debtor"), on December 11, 2012.

31.     Unbeknownst to me at that time, Donald K. Porges designated himself as the sole manager of Judgment Debtor with the Florida Division of Corporations, and has consistently held himself as the sole manager of Plaintiff until March 20, 2015, when I was designated the sole manager.

32.     Donald K. Porges was not supposed to be the sole manager.

33.     According to the Operating Agreement, there were supposed to be three (3) manager.  Specifically, Judgment Debtor's Operating Agreement provided that it would be under the control of the three named managers (i.e., Mrs. Namm, Eric Scholer and Donald K. Porges), with each manager having certain specific designated areas of authority.

34.     My authority was limited, according to the Operating Agreement, to "[m]arketing, securing new accounts, research and development and quality control".

35.     Eric Scholer's scope of authority, according to the Operating Agreement, was "[m]anaging the road show business, general administration (including financial, accounting, insurance and legal functions), marketing, negotiations and logistics".

36.     Donald K. Porges' scope of authority, according to the Operating Agreement, was "[f]inancial, accounting and insurance matters".  Obviously, Mr. Porges, by

designating himself the sole manager, had a lot more control than what was designated in the Operating Agreement.

37.     Plaintiff was in complete control of the finances, book keeping and records of the Judgment Debtor, including, but not limited to, he was responsible for keeping all financial records, invoicing customers, collecting accounts receivables, paying accounts payables, paying payroll (specifically, my compensation package), and accounting for all income and expenses, and was well aware at all times prior to at least March 27, 2015, of the financial status of the Judgment Debtor and how the Judgment Creditor was doing business, as well as the Judgment Debtor's relationship with Deluxe.

38.     Plaintiff knew better than anyone else the Judgment Debtor's ability to incur and service the obligations created by the promissory notes that form the debts that are the subject matter of this action ("Notes").

39.     Plaintiff knew the Judgment Debtor's financial condition at the time they decided to accept the Notes and they accepted the fact that its remedy for non-payment would be limited to collecting the debt from the Judgment Debtor.

40.     For Plaintiff to now claim that I concealed any information, or somehow perpetrated a fraud upon Plaintiff, by having the Judgment Creditor undertake the debt is ludicrous.

41.     I did not conceal, or attempt to conceal, any of the transfers that form the subject matter of this lawsuit, or that are alleged to be fraudulent by Plaintiff, nor did I intent to hinder, injure or defraud anyone by doing business by and through the Judgment Debtor.  In fact, it is quite obvious from the checks themselves and the other bank records, as well as the fact that we have disclosed all the books and records to Plaintiff during the State Court proceedings, that

there was no attempt by me or anyone else on my behalf to conceal the nature of the transfers or the manner in which I was operating the Judgment Debtor after March of 2015.

42.    If I was trying to defraud someone, I certainly would not have made checks payable to my husband's mortgage company, for example.

43.    All the monies I received from the Judgment Creditor were earned by me.

44.    The Judgment Debtor was my life and I devoted my full time to it, mostly after March of 2015.

45.    If anything had to be done to operate or manage the Judgment Debtor, it was up to me to get it done.

46.    I believed at the time, and still believe now, that I was entitled to the monies I received from the Judgment Debtor as compensation for my services to the Judgment Debtor, and I believe that my compensation was more than fair to the Judgment Debtor; in fact, but for my services to the Judgment Debtor, it would not be able to do any business.

47.    While Plaintiff had control of the Judgment Debtor, I was employed to promote and develop the products and I would travel around the country holding shows and my compensation, approved by Plaintiff, was a salary of $75,000.00 a year, an additional advance on future distributions in the amount of $75,000.00 a year, and reimbursement for meals, gas, travel expenses and other miscellaneous items, for an annual compensation package of over $150,000.00.

48.    From March 2015 to June of 2016, I was doing everything that I was doing before March of 2015 and, in addition thereto, I was also responsible for all the work Plaintiff was doing prior to March of 2015, but that I now needed to do or supervise.

49.    I tried to bring current the payment amounts that Plaintiff alleged were

owed on June of 2015, but Plaintiff would not let me pay the amounts owed.

50.     The only reason that the Judgment Debtor went out of business was because Plaintiff forced it out of business by interfering intentionally with the business relationship with its customers, refusing to allow it to make the monthly payments under the promissory notes, garnishing its bank account, and making it impossible for it to continue to do business.

51.     I tried keeping the Judgment Debtor operating after June of 2015 only because I thought that things would work out and Plaintiff would realize the mutual benefit to accepting payments under the promissory notes, as opposed to wanting to destroy the business.

52.     I have never concealed any assets of the Judgment Debtor.

53.     I have never concealed any transfers from the Judgment Debtor.

54.     During that time frame, Plaintiff employed and paid me, and/or was obligated to pay me, $150,000.00 a year ($75,000.00 as earned salary and $75,000.00 as an advancement on future distributions); an amount that Plaintiff believed to be reasonable and fair for the work Ms. Namm was doing during that time frame promoting the barbecue sauce.

55.     In January 2, 2015, Ms. Namm sued two of the principles of Plaintiff (i.e., Jeffrey Brandon and Eric Scholer) for violating the Asset Purchase Agreement dated December 11, 2012.

56.     The essence of that lawsuit was that Plaintiff, and/or its principals, failed to pay Ms. Namm the agreed amount of $150,000.00 a year, as agreed under the Asset Purchase Agreement.

57.     On or about March 27, 2015, as part of the settlement negotiations of the aforementioned lawsuit, Plaintiff relinquished control and ownership of Judgment Debtor to me

in exchange for certain promissory notes to be paid exclusively by Brooklyn's Best LLC.

58.     At that point, my duties and responsibility increased to include all responsibilities previously undertaken by Plaintiff.

59.     There was no longer any division of labor and everything rested on my shoulders.

60.     Plaintiff, at all times material thereto, was represented by a group of attorneys who drafted the promissory note, which group of attorneys included John Page and Bernice Lee, the two (2) attorneys representing Plaintiff in this case.

61.     I did not sign or otherwise guarantee repayment of the promissory notes.

62.     Plaintiff, knowing full well the financial condition of the Judgment Debtor, and knowing me very well, agreed to accept the risks and consequences of Brooklyn's Best LLC not repaying the said notes, and Plaintiff intentionally relinquished its ability to recover, in the event of a default, directly from me.

63.     On June 3, 2015, Plaintiff declared Judgment Debtor in default and refused any further payments under the notes.

64.     Prior to June 3, 2015, I attempted to pay all amounts due under the notes, but Plaintiff refused to accept payment.

65.     I later learned that Plaintiff's attorney, John Page, had already began contacting my customers, as of June 1, 2015.

66.     That was done by Plaintiff's attorney, John Page, sending the Judgment Debtor's customers on June 1, 2015, the letter and enclosures attached as Exhibit "A" to the Judgment Debtor's responsive pleading in the State Case filed by Plaintiff; a copy of the Judgment Debtor's responsive pleading in the State Case is attached hereto and incorporated

herein as Exhibit "A".

67.    The letter was on Mr. Page's letterhead and starts by stating that Mr. Page represents Plaintiff "regarding its claim against Judgment Debtor (underline added)."

68.    The customers were being told by Mr. Page that there was a "claim" against the Judgment Debtor.

69.    In other words, the Judgment Debtor was delinquent in its obligations to Plaintiff or, put another way, the Judgment Debtor was not paying its bills.

70.    The letter then goes on to state that the customer has "an account owing to Judgment Debtor's Best, LLC".

71.    The customer is now being told that the customer owes monies to Judgment Debtor.

72.    That statement is being made without Plaintiff knowing if the customer actually owed anything to the Judgment Debtor at that particular time, and was insulting to the customer because it infers that the customer is delinquent and owes Judgment Debtor monies that it has not timely paid.

73.    Mr. Page then provides the customer with a copy of the promissory notes.

74.    Mr. Page then states to the customer that Judgment Debtor "is now in default" under the "promissory notes and security agreements" and tells the customer that payment "is to be made to" Mr. Page.

75.    Mr. Page also attached his wiring instructions.

76.    My customers were shocked at having received the letters and enclosures, and their reaction was mixed.

77.    Costco, for example, stop doing business with the Judgment Creditor.

78.     The Judgment Debtor was willing and able to bring the payments current, but Mr. Page refused to allow that to happen and insisted that attorney fees in the amount of $12,585.00 had already accrued as of June 11, 2015 and would need to be paid; the email string is attached hereto as Exhibit "B".

79.     Plaintiff's Exhibit 29 purports to state that I took $120,075.32 from Judgment Debtor; that is not true.  From the $120,075.32, at least $39,428.03 were ordinary business expenses of the Judgment Debtor.  I have composed a list which states the purpose for each withdrawal, which I have attached hereto and incorporate herein as Defendants' Exhibit "C".

80.     Plaintiff's Exhibit 30 purports to state that I took $119,105.88 from Deluxe; that is not true.  From the $119,105.88, at least $59,558.38 were business expenses of the Judgment Debtor.  I have composed a detailed listing which states the purpose for each withdrawal, which I have attached hereto and incorporate herein as Defendants' "D".

81.     From March of 2015 to June of 2016, I loaned Judgment Debtor a total sum of $72,564.67, which came from Defendant Jon Namm ("Mr. Namm") and my savings account, which total amount included a transfer from Mr. Namm's 401 K Plan in the amount of $15,500.00.  I have attached hereto and incorporate herein the chart reflecting the loans I made to Judgment Debtor as Defendants' Exhibit "E".

82.     The amounts in Plaintiff's Exhibits 29 and 30, minus the ordinary operating expenses reflected in Defendants Exhibits "B" and "C", were compensation for my services to the Judgment Debtor.  Therefore, my compensation was $72,739.38 for all the work I did for Judgment Debtor from March 2015 until the present date.

83.     All the monetary compensation I received (i.e., $72,739.38) for working

for the Judgment Debtor after March of 2015 directly benefitted the Judgment Debtor and was less than what would have been reasonable to pay me for my services.  Also, but for my work for the Judgment Debtor after March 2015, the Judgment Debtor would have gone out of business in June 2015, instead of June of 2016, when Plaintiff made it impossible to continue doing business.

84.     As to Plaintiff's Statement of Undisputed Facts ¶41 and ¶42, the $11,365.00 and $3,718.89 belonged to JMT and not Deluxe or Judgment Debtor.  The customer mistakenly sent the check to Deluxe.

85.     As to Plaintiff's Statement of Undisputed Facts ¶9: Plaintiff was repeatedly instructed by me to contact the customers and advise them that the Judgment Debtor is the company doing business, not Deluxe, and to instruct the customers to forward payment to the Judgment Creditor not Deluxe.  Plaintiff refused to do so.  Instead, Plaintiff continued to accept checks and deposits made payable to Deluxe, endorsing many of the checks as "Twin Tower Trading Inc" and/or "Bea's Brooklyn's Best LLC", and depositing them in Bea's Brooklyn's bank account. I have attached copies of those canceled checks, as Exhibit "F". Plaintiff controlled and made the deposits of all checks owed to Bea's Brooklyn, whether or not the check was made payable to Deluxe or the Judgment Creditor up to March 27, 2015.

86.     As to Plaintiff's Statement of Undisputed Facts ¶10: The transcript speaks for itself and does not support that statement.  As to the second sentence, I did testified to that affect but I was mistaken.  The reason why those checks were deposited in Deluxe was because the checks were made payable to Deluxe.

87.     As to Plaintiff's Statement of Undisputed Facts ¶36: I understood the interrogatory to be asking about transfer of personal property and that is the way I answered that

interrogatory.  You will note that the very next interrogatory request information on "money" and at that time the Judgment Debtor had provided all its books and records, as well as his accountant's deposition had been taken and Plaintiff had in its possession all the books and records of Plaintiff.

88.     As to Plaintiff's Statement of Undisputed Facts ¶13: I disagree that on April 27, 2015, the Judgment Debtor defaulted on the payments due under the Notes.  That is false.  The Judgment Debtor was not in default under the Notes on April 27, 2015.

89.     As to Plaintiff's Statement of Undisputed Facts ¶31: It is misleading and false to state that Deluxe and the Judgment Creditor sale the same products.  Deluxe has not sold anything since 2012; all the selling has been done by the Judgment Creditor, even if checks were sent to the Judgment Creditor in the name of Deluxe.  Plaintiff was repeatedly instructed by me to contact the Judgment Debtor's customers and advise them that the Judgment Creditor is the company doing business and to instruct them to forward payment to the Judgment Creditor, instead of Deluxe.

90.     As to Plaintiff's Statement of Undisputed Facts ¶33: I do not know who "Deluxe Gourmet", but Deluxe is not the same company as the Judgment Creditor; they are two separate and distinct companies.

**AFFIANT SAYETH NOTHING FURTHER.**

_____
BEATRICE NAMM

STATE OF ___New Jersey___
COUNTY OF ___Middlesex___

    I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgments, personally appeared to me BEATRICE NAMM, who I personally know or who provided identification in the form of a driver license to establish her identity to me, and who did take an oath, and who executed the foregoing Affidavit and she acknowledged before me that she executed the same freely and voluntarily and that the facts contained therein are true, correct and based on her personal knowledge.

    WITNESS my hand and official seal in the County and State last aforesaid this ___01___ day of May, 2017.

_____
Notary Public

SANDEEP MALHOTRA
Notary Public, New Jersey
My Commission Expires July 29, 2018

## Submitted by:

*Gus R. Benitez, Esquire*
Fl Bar Number 278130
1223 East Concord Street
Orlando, Florida 32803
(407) 894-5000