UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

TTT FOODS HOLDING COMPANY LLC,
a Florida limited liability company,
        Plaintiff,
v.                                                                            Case No.: 9:16-cv-81798-DMM

BEATRICE NAMM, an individual,
JONATHAN NAMM, an individual, and
DELUXE GOURMET SPECIALTIES LLC,
a New Jersey limited liability company,
        Defendants.
_____/

**AFFIDAVIT IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

STATE OF FLORIDA
COUNTY OF ORANGE

      BEFORE ME, the undersigned authority, personally appeared BEATRICE NAMM, known to me to be the person described herein, who, after being duly sworn, does state as follows:

      1.     I am over the age of 21 and all statements made herein are based on my personal knowledge.

      2.     I developed some unique formulae and recipes for spaghetti and barbecue sauces, and salsas ("Recipes").

      3.     Starting in 2006, without any prior business experience, I started to produce and sell spaghetti and barbecue sauces, and salsas, out of my home in New Jersey.

      4.     I eventually organized Defendant DELUXE GOURMET SPECIALTIES LLC, a New Jersey limited liability company ("Deluxe"), and started doing the sauces and salsa

business through Deluxe.

5. I am the sole manager and member of Deluxe.

6. The Recipes were assets of Deluxe until they were transferred to the Judgment Debtor pursuant to the Asset Purchase Agreement on or about December of 2012.

7. The Recipes were very successful and have significant value.

8. In 2012, when the Recipes were transferred to the Judgment Debtor, Bea's Brooklyn's Best, LLC, a Florida limited liability company ("Judgment Debtor"), paid me the sum $300,000.00 for 49% of the assets of Deluxe, the biggest asset of Deluxe being the Recipes.

9. When Plaintiff sold its 49% ownership interest back to the Judgment Debtor in March of 2015, I, on behalf of the Judgment Debtor, agreed to pay Plaintiff the sum of $320,000.01, recognizing the significant value of the assets of Judgment Debtor; the most valuable of the assets being the Recipes.

10. The Recipes have value today.

11. The Recipes have had value at all times since March 15, 2015.

12. The Recipes are assets of the Judgment Debtor.

13. I believe the Recipes have a significant value today, which exceeds Plaintiff's debt.

14. I believe that the value of the Recipes, at all times since March 2015, was well over the debt owed to Plaintiff.

15. The Recipes are still available to Plaintiff and have value which exceeds the remaining debts of the Judgment Debtor.

16. Neither I nor the Judgment Debtor have transferred to anyone any of the Recipes.

17. There is no question that the Judgment Debtor is not now, nor as it ever been, insolvent.

18. Judgment Debtor was not insolvent on March 2015, nor at any other time when any of the transfers that form the subject matter of this lawsuit were made, nor is it insolvent today.

19. The assets of Judgment Debtor exceed the amount of all the debts of Judgment Debtor, and that fact was true on March of 2015, it was true from March 2015 to June of 2016, and is still true today.

20. I disagree with William G. King's report and conclusion that the Judgment Debtor was insolvent at any time when any of the transfers that Plaintiff is alluding to in his undisputed facts statement submitted to the Court.

21. JMT Food Group LLC, a Florida limited liability company ("JMT"), as nothing to do with Deluxe or the Judgment Creditor.

22. On January 15, 2015, I organized JMT to manufacture and distribute hummus, a totally distinct product from the Recipes and the barbecue sauces and pastas and salsas that Judgment Debtor sold, and totally unrelated to the Judgment Debtor.

23. Generally speaking, hummus is a Levantine dip or spread made from cooked, mashed chickpeas or other beans, blended with tahini, olive oil, lemon juice, salt and garlic.

24. Hummus is not a spaghetti or barbecue sauce or a salsa.

25. JMT has never been in the business of manufacturing or distributing spaghetti or barbecue sauces, or salsa.

26. Neither Deluxe nor Judgment Debtor were ever in the business of manufacturing or distributing hummus.

27. Plaintiff was organized on December 11, 2012, by Donald K. Porges.

28. Donald K. Porges was designated as the sole manager of Plaintiff, and as consistently been the sole manager of Plaintiff.

29. Donald K. Porges is, and was at all times material hereto, a practicing certified public accountant with his own CPA firm.

30. Donald K. Porges organized Bea's Brooklyn's Best LLC, a Florida limited liability company ("Judgment Debtor"), on December 11, 2012.

31. Unbeknownst to me at that time, Donald K. Porges designated himself as the sole manager of Judgment Debtor with the Florida Division of Corporations, and has consistently held himself as the sole manager of Plaintiff until March 20, 2015, when I was designated the sole manager.

32. Donald K. Porges was not supposed to be the sole manager.

33. According to the Operating Agreement, there were supposed to be three (3) manager. Specifically, Judgment Debtor's Operating Agreement provided that it would be under the control of the three named managers (i.e., Mrs. Namm, Eric Scholer and Donald K. Porges), with each manager having certain specific designated areas of authority.

34. My authority was limited, according to the Operating Agreement, to "[m]arketing, securing new accounts, research and development and quality control".

35. Eric Scholer's scope of authority, according to the Operating Agreement, was "[m]anaging the road show business, general administration (including financial, accounting, insurance and legal functions), marketing, negotiations and logistics".

36. Donald K. Porges' scope of authority, according to the Operating Agreement, was "[f]inancial, accounting and insurance matters". Obviously, Mr. Porges, by designating himself the sole manager, had a lot more control than what was designated in the Operating Agreement.

37. Plaintiff was in complete control of the finances, book keeping and records of the Judgment Debtor, including, but not limited to, he was responsible for keeping all financial records, invoicing customers, collecting accounts receivables, paying accounts payables, paying payroll (specifically, my compensation package), and accounting for all income and expenses, and was well aware at all times prior to at least March 27, 2015, of the financial status of the Judgment Debtor and how the Judgment Creditor was doing business, as well as the Judgment Debtor's relationship with Deluxe.

38. Plaintiff knew better than anyone else the Judgment Debtor's ability to incur and service the obligations created by the promissory notes that form the debts that are the subject matter of this action ("Notes").

39. Plaintiff knew the Judgment Debtor's financial condition at the time they decided to accept the Notes and they accepted the fact that its remedy for non-payment would be

limited to collecting the debt from the Judgment Debtor.

40. For Plaintiff to now claim that I concealed any information, or somehow perpetrated a fraud upon Plaintiff, by having the Judgment Creditor undertake the debt is ludicrous.

41. I did not conceal, or attempt to conceal, any of the transfers that form the subject matter of this lawsuit, or that are alleged to be fraudulent by Plaintiff, nor did I intent to hinder, injure or defraud anyone by doing business by and through the Judgment Debtor.  In fact, it is quite obvious from the checks themselves and the other bank records, as well as the fact that we have disclosed all the books and records to Plaintiff during the State Court proceedings, that there was no attempt by me or anyone else on my behalf to conceal the nature of the transfers or the manner in which I was operating the Judgment Debtor after March of 2015.

42. If I was trying to defraud someone, I certainly would not have made checks payable to my husband's mortgage company, for example, but instead I would have concealed the nature of thed transfer, which I did not.

43. All the monies I received from the Judgment Creditor were either repayment to me of monies I loaned to the Judgement Debtor or monies I earned for my services to the Judgment Debtor.

44. The Judgment Debtor was my life and I devoted my full time to it until I realized it was futile to try to keep it in business because of Plaintiff's conduct.

45. If anything had to be done to operate or manage the Judgment Debtor, it was up to me to get it done.

46. I believed at the time, and still believe now, that I was entitled to the monies I received from the Judgment Debtor as compensation for my services to the Judgment Debtor and I believe that the compensation was more than fair to the Judgment Debtor and far less than what Plaintiff and the Judgment Debtor agreed to pay me; in fact, my compensation had been established by Plaintiff in 2012 at a minimum of a salary of $75,000.00 plus $75,000.00 in advanced distribution, and but for my services to the Judgment Debtor, it would not be able to do any business and would have ceased to operate in June of 2015.

47. While Plaintiff had control of the Judgment Debtor, I was employed to promote and develop the products and I would travel around the country holding shows and my compensation, approved by Plaintiff, was a salary of $75,000.00 a year, an additional advance on future distributions in the amount of $75,000.00 a year, and reimbursement for meals, gas, travel expenses and other miscellaneous items, for an annual compensation package of over $150,000.00.  My compensation agreement with the Judgment Debtor after March 2015 did not change, except for the fact that the Judgment Debtor did not pay me because Plaintiff's conduct caused a significant loss of business.

48. From March 2015 to June of 2016, I was responsible to do everything that I was doing before March of 2015 and, in addition thereto, I was also responsible for all the work Plaintiff was doing prior to March of 2015, which work I needed to do or supervise after March of 2015..

49. I tried to bring current the payment amounts that Plaintiff alleged were owed on June of 2015, but Plaintiff would not let me pay the amounts owed.

50. The only reason that the Judgment Debtor went out of business was because Plaintiff forced it out of business by interfering intentionally with the business relationship with its customers, refused to allow it to make the monthly payments under the Notes, garnished its bank account after obtaining a final judgment, and make it impossible for it to continue to do business.

51. I tried keeping the Judgment Debtor operating after June of 2015 only because I thought that things would work out and Plaintiff would realize the mutual benefit to accepting payments under the promissory notes, as opposed to wanting to destroy the business; I was wrong.

52. I have never concealed any assets of the Judgment Debtor.

53. I have never concealed any transfers from the Judgment Debtor, nor did I have ever concealed any monies I was paid by the Judgment Creditor.

54. The Judgment Creditor employed and paid me, and/or was obligated to pay me, $150,000.00 a year ($75,000.00 as earned salary and $75,000.00 as an advancement on future distributions), and that was agreed to by Plaintiff; an amount that Plaintiff believed to be reasonable and fair by Plaintiff for the work I was doing during that time frame (i.e., 2012 to March 2015) promoting the barbecue sauce, which was less responsibilities than I was given after March 2015.

55. During 2015 and 2016, the Judgment Debtor was still obligated to pay me the $150,000.00. However, I was not paid that amount.

56. In January 2, 2015, Ms. Namm sued two of the principles of Plaintiff (i.e.,

Jeffrey Brandon and Eric Scholer) for violating the Asset Purchase Agreement dated December 11, 2012.

57. On or about March 27, 2015, as part of the settlement negotiations of the aforementioned lawsuit, Plaintiff relinquished control and ownership of Judgment Debtor to me in exchange for certain promissory notes to be paid exclusively by Brooklyn's Best LLC.

58. At that point, my duties and responsibility increased to include all responsibilities previously undertaken by Plaintiff.

59. There was no longer any division of labor and everything rested on my shoulders.

60. Plaintiff, at all times material thereto, was represented by a group of attorneys who drafted the promissory note, which group of attorneys included John Page and Bernice Lee, the two (2) attorneys representing Plaintiff in this case.

61. I did not sign or otherwise guarantee repayment of the promissory notes.

62. Plaintiff, knowing full well the financial condition of the Judgment Debtor, and knowing me very well and knowing the compensation I was paid by the Judgment Debtor, agreed to accept the risks and consequences of the Judgment Debtor not repaying the said notes, knowing that I would be getting paid at least $75,000.00 in salary, if not the entire $150,000.00 compensation package Plaintiff had agreed to and the Judgment Debtor had undertaken.

63. On June 3, 2015, Plaintiff declared Judgment Debtor in default and refused any further payments under the notes.

64. Prior to June 3, 2015, I attempted to pay all amounts due under the notes, but Plaintiff refused to accept payment.

65. I later learned that Plaintiff's attorney, John Page, had already began contacting my customers, as of June 1, 2015.

66. That was done by Plaintiff's attorney, John Page, sending the Judgment Debtor's customers on June 1, 2015, the letter and enclosures attached as Exhibit "A" to the Judgment Debtor's responsive pleading in the State Case filed by Plaintiff; a copy of the Judgment Debtor's responsive pleading in the State Case is attached hereto and incorporated herein as Exhibit "A".

67. The letter was on Mr. Page's letterhead and starts by stating that Mr. Page represents Plaintiff "regarding its claim against Judgment Debtor (underline added)."

68. The customers were being told by Mr. Page that there was a "claim" against the Judgment Debtor.

69. In other words, the Judgment Debtor was delinquent in its obligations to Plaintiff or, put another way, the Judgment Debtor was not paying its bills.

70. The letter then goes on to state that the customer has "an account owing to Judgment Debtor's Best, LLC".

71. The customer is now being told that the customer owes monies to Judgment Debtor.

72. That statement is being made without Plaintiff knowing if the customer actually owed anything to the Judgment Debtor at that particular time, and was insulting to the

customer because it infers that the customer is delinquent and owes Judgment Debtor monies that it has not timely paid.

73. Mr. Page then provides the customer with a copy of the promissory notes.

74. Mr. Page then states to the customer that Judgment Debtor "is now in default" under the "promissory notes and security agreements" and tells the customer that payment "is to be made to" Mr. Page.

75. Mr. Page also attached his wiring instructions.

76. My customers were shocked at having received the letters and enclosures, and their reaction was mixed.

77. Costco, for example, stop doing business with the Judgment Creditor as a direct result of Mr. Page's letter and enclosures.

78. The Judgment Debtor was willing and able to bring the payments current, but Mr. Page refused to allow it to pay the delinquently amount, insisted insisting that attorney fees in the amount of $12,585.00 had already accrued as of June 11, 2015 and would need to be paid (for just a few days of work in drafting and sending the letter of June 1, 2015); the email string is attached hereto as Exhibit "B".

79. As to Plaintiff's Statement of Undisputed Facts ¶ 44, Plaintiff's Exhibit 25 purports to state that I took $120,075.32 from Judgment Debtor; that is not true. From the $120,075.32 on Plaintiff's Exhibit 25, the amount of $75,347.19 consisted of business expenses of the Judgment Debtor, leaving $44,728.13 which was provided to me to reimburse me for the loans to the Judgment Debtor and as part of my compensation. I composed a list which states the

purpose for each withdrawal, which is attached hereto as Exhibit "C".

80. As to Plaintiff's Statement of Undisputed Facts ¶ 45, Plaintiff's Exhibit 26 purports to state that Mrs. Namm took $119,105.88 from Deluxe; that is not true. From the $119,105.88 Plaintiff's Exhibit 26, the amount of $68,933.53 consisted of business expenses of the Judgment Debtor, leaving $50,172.35 which was provided to me to reimburse me for my loans to the Judgment Debtor and as part payment of my salary and compensation. I composed a list which states the purpose for each withdrawal, which is attached hereto as Exhibit "D".

81. I loaned the Judgment Debtor a total of $78,689.67. When you add the $44,728.13 net amount from Plaintiff's Exhibit 25 and the $50,172.35 net amount from Plaintiff's Exhibit 26 and subtract from that the $78,689.67 loaned amount, my paid salary was $16,210.81 for all my services to the Judgment Debtor from March 2015 to the present day. I have attached hereto and incorporate herein the chart reflecting the loans I made to Judgment Debtor as Exhibit "E".

82. The amounts in Plaintiff's Exhibits 25 and 26, minus the ordinary operating expenses reflected in Defendants Exhibits "B" and "C", were compensation for my services to the Judgment Debtor. Therefore, my compensation was $16,210.81 for all the work I did for Judgment Debtor from March 2015 until the present date.

83. All the monetary compensation I received (i.e., $16,210.81) for working for the Judgment Debtor after March of 2015 directly benefitted the Judgment Debtor and was less than what is reasonable to pay for my services to the Judgment Debtor. Also, but for my work for the Judgment Debtor after March 2015, the Judgment Debtor would have gone out of

business in June 2015, instead of June of 2016 (when Plaintiff made it impossible for the Judgment Debtor to continue doing business).

84. As to Plaintiff's Statement of Undisputed Facts ¶41 and ¶42, the $11,365.00 and $3,718.89 belonged to JMT, not Deluxe or the Judgment Debtor; JMT's customer mistakenly sent the check to Deluxe. Shoprite and some other accounts were purchasing hummus from JMT. Those same customers and accounting department never made the changes to JMT and did mail checks that said Deluxe Gourmet Specialties in error. Their accounts payable department should have made the checks payable to JMT. Once those checks cleared they were transferred to JMT. Plaintiff has all the records that would verify the foregoing facts, for they have subpoena all records of the customers.

85. As to Plaintiff's Statement of Undisputed Facts ¶9: Plaintiff was repeatedly instructed by me to contact the customers and advise them that the Judgment Debtor is the company doing business, not Deluxe, and to instruct the customers to forward payment to the Judgment Creditor not Deluxe. Plaintiff refused to do so. Instead, Plaintiff continued to accept checks and deposits made payable to Deluxe, endorsing many of the checks as "Twin Tower Trading Inc" and/or "Bea's Brooklyn's Best LLC", and depositing them in Bea's Brooklyn's bank account. I have attached copies of those canceled checks, as Exhibit "F". Plaintiff controlled and made the deposits of all checks owed to Bea's Brooklyn, whether or not the check was made payable to Deluxe or the Judgment Creditor up to March 27, 2015.

86. As to Plaintiff's Statement of Undisputed Facts ¶10: The transcript speaks for itself and does not support that statement. As to the second sentence, I did testified to that

affect but I was mistaken.  The reason why those checks were deposited in Deluxe was because the checks were made payable to Deluxe.

87. As to Plaintiff's Statement of Undisputed Facts ¶11, records for account ending in 6618 speak for themselves.  Furthermore, it was common practice of the Judgment Debtor, since 2012, to receive checks made payable to Deluxe.  Plaintiff had the ability to deposit in the Judgment Debtor's account checks made payable to Deluxe, but I did not have the banking connections that allowed me to do so, so I had to deposit the Deluxe checks in the Deluxe bank account.

88. As to Plaintiff's Statement of Undisputed Facts ¶12, I made the statement but I was mistaken.

89. As to Plaintiff's Statement of Undisputed Facts ¶13, that is untrue; the Notes were not in default on April 27, 2015, as self evident from the Notes themselves, as well as the letter referred to by Plaintiff.  My position was and is that the Judgment Debtor was not in default on April 27, 2015.

90. Defendants admit Plaintiff's Statement of Undisputed Facts ¶14, except that Defendants' position was in the State Court that there was no default under the Notes.

91. As to Plaintiff's Statement of Undisputed Facts ¶28, the statement is not true.  While Deluxe and JMT operated out of the indicated address, prior to March of 2015 the Judgment Debtor operated out of Florida.

92. As to Plaintiff's Statement of Undisputed Facts ¶23, any transaction after my resignation would have been part of the winding down of the business and the last check

cleared on June 26, 2016, for an invoice mailed on May 15, 2016.

93. As to Plaintiff's Statement of Undisputed Facts ¶29, ¶31 and ¶32, Deluxe was not in business after 2012 and as such, had no customers and did not sell anything after 2012. Deluxe has not sold anything since 2012; all the selling has been done by the Judgment Creditor, even if checks were sent to the Judgment Creditor in the name of Deluxe. Plaintiff was repeatedly instructed by me to contact the Judgment Debtor's customers and advise them that the Judgment Creditor is the company doing business and to instruct them to forward payment to the Judgment Creditor, instead of Deluxe. The fact that customers made their check payable to Deluxe did not change that fact. It is misleading and false to state that Deluxe and the Judgment Creditor sale the same products. All the selling was been done by the Judgment Creditor after 2012, even if checks were sent to the Judgment Creditor in the name of Deluxe.

94. Plaintiff's Statement of Undisputed Facts ¶33 and ¶34 are untrue. Deluxe is not the same company as the Judgment Debtor, and "Deluxe Gourmet" or "Deluxe Gourmet Specialties" are not separate companies, but both are a reference to Deluxe. The amounts shown on Exhibit 19 are payments belonging to JMT that were made payable to "Deluxe Gourmet" or "Deluxe Gourmet Specialties" by mistake and were properly deposited or transferred to the JMT's bank account.

95. As to Plaintiff's Statement of Undisputed Facts ¶35: When I saw that Kaltec (one of the manufacturers for the Judgment Debtor) invoice due dates were approaching, I would withdraw funds from the Judgment Creditor's account and deposit them into Deluxe account ending in 6618 to combine Deluxe and the Judgment Creditor's monies together to

complete the amount of monies owed. Since Kaltec was a TD bank customer (and to save me wiring fees) I would sometimes deposit the cash into the Deluxe bank account then ask for a deposit slip and deposit funds right into the Kaltec's TD Bank account ending 5492 and then confirm with Lisa, a person in their accounting department, that the funds went through. I should note that Plaintiff subpoenaed all Kaltec invoices so all this information is in Plaintif's possession. .

96. As to Plaintiff's Statement of Undisputed Facts ¶36: I understood the interrogatory to be asking about transfer of personal property and that is the way I answered that interrogatory. You will note that the very next interrogatory request information on "money" and at that time the Judgment Debtor had provided all its books and records, as well as his accountant's deposition had been taken and Plaintiff had in its possession all the books and records of Plaintiff.

97. As to Plaintiff's Statement of Undisputed Facts ¶ 40, that statement is untrue. Deluxe did not transfer the $118,737.56 to or for the benefit of my husband and I.

98. Defendants does not dispute the statement in Plaintiff's Statement of Undisputed Facts ¶44, but JMT had nothing to do with the Judgment Debtor and is a separate and distinct company with separate and distinct products.

99. As to Plaintiff's Statement of Undisputed Facts ¶ 47, I dispute this statement in that Mr. Namm assisted me from time to time in my work for the Judgment Debtor.

100. As to Plaintiff's Statement of Undisputed Facts ¶ 49, I deny that statement in that I gave other explanations as to the transfer, whatever transfers are being referred to by

Plaintiff. If the statement is meant to refer only as to what I said or did not say during my deposition, the transcript speaks for itself.

101. As to Plaintiff's Statement of Undisputed Facts ¶ 50, I deny that statement in that there is evidence that some of the transfers, whatever transfers are being referred to by Plaintiff at the time, were for her salary. If the statement is meant to refer only as to what I said or did not say during my deposition, the transcript speaks for itself.

102. As to Plaintiff's Statement of Undisputed Facts ¶ 51, I deny this statement. There were in fact payments regularly made by the Judgment Debtor to me for my salary and compensation, in unequal amounts.

103. As to Plaintiff's Statement of Undisputed Facts ¶ 52, I am not an accountant and the tax returns depicted speak for themselves.

104. As to Plaintiff's Statement of Undisputed Facts ¶ 53, my deposition transcript speaks for itself. I am not an accountant and I have an accountant due my tax returns.

105. I deny Plaintiff's Statement of Undisputed Facts ¶ 57 and 58. Judgment Debtor was not insolvent during the period of March 27, 2015 through June 30, 2016. Mr. King's report says what it says, but I disagree with Mr. King's conclusions and opinions because the assets of Judgment Debtor exceeds its liabilities and but for Plaintiff's intentional interference with the Judgment Debtor's customers and Mr. King noting the entire debt due on the Notes each month, the Judgment was making money. I disagree with Mr. King's report and findings and disputes the facts, assumptions and method by which it determined that in his opinion the Judgment Debtor was insolvent, and I note that no affidavit was provided by Mr.

King.

106. As to Plaintiff's Statement of Undisputed Facts ¶ 61, the statement is misleading. Kaltec payments were always behind because payment on their invoice was due 30 days after invoicing.

**AFFIANT SAYETH NOTHING FURTHER.**

_____
BEATRICE NAMM

STATE OF __New Jersey__
COUNTY OF __Middlesex__

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgments, personally appeared to me BEATRICE NAMM, who I personally know or who provided identification in the form of a driver license to establish her identity to me, and who did take an oath, and who executed the foregoing Affidavit and she acknowledged before me that she executed the same freely and voluntarily and that the facts contained therein are true, correct and based on her personal knowledge.

WITNESS my hand and official seal in the County and State last aforesaid this __3__ day of May, 2017.

_____ 5/3/17
Notary Public