UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 16-cv-81798-MIDDLEBROOKS

TTT FOODS HOLDING COMPANY LLC,
a Florida limited liability company,

       Plaintiff,

v.

BEATRICE NAMM, an individual,
JONTHAN NAMM, an individual, and
DELUXE GOURMET SPECIALTIES LLC,
a New Jersey limited liability company,

       Defendants.

_____/

## <u>ORDER GRANTING IN PART AND DENYING IN PART</u><br><u>PARTIAL MOTION FOR SUMMARY JUDGMENT</u>

THIS CAUSE comes before the Court on Plaintiff TTT Foods Holding Company LLC's ("Plaintiff") Partial Motion for Summary Judgment ("Motion"), filed on April 17, 2017.  (DE 74).  Defendants Beatrice Namm ("Mrs. Namm."), Jonathan Namm ("Mr. Namm"), and Deluxe Gourmet Specialties LLC ("Deluxe") (collectively, "Defendants") filed a response on May 3, 2017 (DE 80), to which Plaintiff replied on May 10, 2017 (DE 85).  Plaintiff seeks summary judgment on Counts I, II, III, V, VI, and VII.  For reasons stated below, Plaintiff's Motion is granted in part and denied in part.

### I.    Background

####     *a.  Bea's Brooklyn's Best*

Before December 2012, Mrs. Namm purchased and sold pasta, barbeque sauce, and salsa ("Pasta Business") to various retailers and distributors through Deluxe, which did business under the tradename "Bea's Brooklyn's Best."  (Plaintiff's Statement of Facts ("PSOF"), DE 75 ¶¶ 1,

2; Defendants' Statement of Facts ("DSOF"), DE 82 ¶ 1).  On December 11, 2012, Mrs. Namm and Plaintiff entered into an Asset Purchase Agreement, in which Mrs. Namm transferred the Pasta Business and all of Deluxe's assets from Deluxe to Bea's Brooklyn's Best, LLC ("BBB"), a newly organized Florida limited liability company, and Plaintiff paid $300,000 for a 49% ownership interest in BBB ("Asset Sale").  (PSOF ¶¶ 3, 4; DSOF ¶ 1).  Mrs. Namm owned the remaining 51% interest in BBB.  (PSOF ¶ 3; DSOF ¶ 1).

> b.  *The Settlement*

Relations deteriorated between Plaintiff and Mrs. Namm, leading to litigation in January 2015.  (PSOF ¶ 5; DSOF ¶ 1; Mrs. Namm Affidavit ("Namm Aff."), DE 81 ¶ 56).  In March 2015, the parties to the litigation reached a Settlement Agreement, in which Plaintiff surrendered its 49% interest in BBB, and in exchange, BBB agreed to pay Plaintiff $320,000.01 ("Settlement").  (PSOF ¶ 5; DSOF ¶ 1).  BBB agreed to pay $150,000 in cash, and executed two promissory notes and security agreements on March 27, 2015 ("Notes"), promising to pay the remaining $170,000.01 to Plaintiff. (PSOF ¶ 5; DSOF ¶ 1; Notes, DE 75-3).

> c.  *Foreclosure on the Notes*

On June 3, 2015, Plaintiff sued BBB for defaulting on its payments due under the Notes. (PSOF ¶ 14; DSOF ¶ 7).  On April 18, 2016, Palm Beach County Circuit Court found in favor of Plaintiff, and awarded Plaintiff $176,001.76, plus 4.75% interest.  (PSOF ¶ 15; DSOF ¶ 8).  On May 16, 2016, the state court awarded Plaintiff $47,178.68 in attorney's fees, plus 4.78% interest.  (PSOF ¶ 17; DSOF ¶ 8).  Based on the state court's judgment, BBB is indebted to Plaintiff in the amount of $233,593.59, as of April 17, 2017 ("Judgment"), none of which had been paid as of the date of filing the instant Complaint.  (PSOF ¶¶ 18, 19; DSOF ¶ 8).

### d. Deluxe

After the December 12, 2012 Asset Sale, BBB's revenue was supposed to be deposited in BBB's bank accounts. (PSOF ¶ 9; DSOF ¶ 2). On July 1, 2014, Mrs. Namm opened a checking account, No. 6618, and a savings account, No. 8470, in the name of Deluxe. (PSOF ¶ 8; DSOF ¶ 1). Deluxe's bank statements for account no. 6618 show $307,363.83 in deposits beginning February 24, 2015 and ending October 5, 2016.[1] (PSOF ¶ 11; DSOF ¶ 4). Mrs. Namm testified that she deposited BBB's funds into Deluxe's bank account because Plaintiff was "threatening to just take everything away" in the foreclosure lawsuit, and she needed to continue paying BBB's expenses and her personal expenses, such as her mortgage. (PSOF ¶ 12; DSOF ¶ 5). In her Statement of Facts and affidavit, Mrs. Namm now asserts that her prior testimony was "mistaken" and that she deposited the funds into Deluxe's bank accounts because some customers made their checks payable to Deluxe. (DSOF ¶¶ 3, 4).

Mrs. Namm also testified that she deposited BBB's revenue into Deluxe's bank accounts because "[i]t was all still the same at the end of the day" since BBB and Deluxe were "one in the same." (Mrs. Namm Deposition ("Namm Dep."), DE 75-1, 94:19-95:2). Mrs. Namm was the sole member of, and in charge of day-to-day operations for, BBB and Deluxe. (PSOF ¶¶ 25-27; DSOF ¶ 10). Mrs. Namm testified that BBB and Deluxe operate out of the same location, share the same customers, manufacturers, and freight companies, and sell the same product. (PSOF ¶¶ 28, 29, 31, 32, 33). Mrs. Namm now denies these statements as misleading because, she asserts, Deluxe was no longer in business after 2012.[2] (DSOF ¶ 12).

---

[1] Mrs. Namm does not deny that the deposits into Deluxe's bank accounts began in February 24, 2015, (DSOF ¶ 4), although she previously testified in her deposition that she did not begin depositing BBB's revenue into Deluxe's bank accounts until March, April, or May of 2016. (PSOF ¶ 10; DSOF ¶ 3).
[2] Mrs. Namm also clarifies that prior to March 2015, BBB operated out of Florida. (DSOF ¶ 11).

*e.  JMT*

A few months before the Settlement, on January 15, 2015, Mrs. Namm organized JMT Food Group, LLC ("JMT"), and listed herself as manager.  (PSOF ¶ 7; DSOF ¶ 1).   On September 16, 2015, Mrs. Namm opened bank account no. 8586 for JMT.  (PSOF ¶ 24; DSOF ¶ 10).  Mrs. Namm is the sole member of, and in charge of day-to-day operations for, JMT. (PSOF ¶¶ 25, 27; DSOF ¶ 10).  JMT operates out of the same location as BBB and Deluxe, and shares many of the same customers.  (PSOF ¶¶ 28, 30; DSOF ¶ 11).

*f.  Transfers*

Plaintiff asserts that after the March 27, 2015 Settlement through December 31, 2016, BBB, Deluxe, and JMT transferred $239,181.20 to or for the benefit of Mr. and Mrs. Namm. (PSOF ¶¶ 45, 46).  Mrs. Namm counters that $78,689.67 was for repayment of a loan she made to BBB, $16,210.81 was for her BBB salary, and the remainder was for BBB's business expenses.  (DSOF ¶¶ 21, 22).

Plaintiff further asserts that, since the Settlement, BBB's bank records show that BBB transferred $102,522.44 to or for the benefit of Mr. and Mrs. Namm. (PSOF ¶ 34; DSOF ¶¶ 21, 22).  Mrs. Namm denies this statement, citing her affidavit.[3]  (DSOF ¶ 13).  The Parties do not dispute that these transfers include $32,400 transferred to Deluxe after the state court suit was filed, as well as payments to two mortgage companies, to which Mr. Namm owed mortgage payments for the Namms' personal residence, and to Toyota and Progressive Insurance for Mr. Namm's vehicle.  (PSOF ¶¶ 35, 37, 38; DSOF ¶¶ 14, 16).  Mrs. Namm explains that the payments to Deluxe were necessary because BBB's manufacturer shared the same bank as Deluxe, and Mrs. Namm wanted to avoid transfer fees.  (DSOF ¶ 14).  On September 20, 2016,

---

[3] Circularly, Mrs. Namm's affidavit contains the exact same blanket denial as her Statement of Fact.  (Namm Aff. ¶ 94).

in response to an interrogatory in aid of execution on Plaintiff's Judgment, Mrs. Namm, on behalf of BBB, swore that BBB had not sold or transferred personal property in the last four years, although Mrs. Namm states that she misunderstood the question.  (PSOF ¶ 36; DSOF ¶ 15).

Plaintiff asserts that, since the Settlement, Deluxe's bank records show that Deluxe transferred $118,737.56 to or for the benefit of Mr. and Mrs. Namm. (PSOF ¶ 40).  Mrs. Namm denies that these transfers were for her or Mr. Namm's benefit, citing her affidavit.[4]  (DSOF ¶ 17).  The Parties agree that this amount includes $11,365 transferred to JMT since February 2, 2016.  (PSOF ¶ 41; DSOF ¶ 18).  When asked, in her deposition, about a specific $1,805 transfer from Deluxe to JMT, Mrs. Namm testified that she did not know why the money was transferred and that Deluxe did not receive anything in return for the transfer.  (PSOF ¶ 43; DSOF ¶ 19).

Between March 9, 2016 and February 13, 2017, Mrs. Namm deposited checks made payable to Deluxe, which totalled $3,718.89, into JMT's bank account no. 8565.  (PSOF ¶ 42).

Since December 1, 2015, JMT transferred $21,988.08 to Mr. and Mrs. Namm.  (PSOF ¶ 44; DSOF ¶ 20).

The money deposited into the Namms' Bank of America joint checking account no. 2389 and TD Bank joint savings account no. 3496 was used for family expenses and benefitted Mr. Namm.  (PSOF ¶ 48; DSOF ¶ 25).  In his deposition, Mr. Namm testified that he never worked for BBB, Deluxe, or JMT, and never provided anything in exchange for the monies paid him by BBB.  (PSOF ¶ 47; Jon Namm Deposition ("J. Namm Dep."), DE 75-28, 12:6-21).  However,

---

[4] Mrs. Namm's affidavit contains the exact same blanket denial as her Statement of Fact.  (Namm. Aff. ¶ 97).

Mrs. Namm asserts that Mr. Namm "did assist her from time to time in her work for [BBB]."[5] (DSOF ¶ 24).

Plaintiff asserts that there is no evidence that $16,210.81 in transfers from BBB, Deluxe, and JMT were for Mrs. Namm's salary, to which Mrs. Namm replies that "there is evidence that some of the transfers, whatever transfers are being referred to by Plaintiff at the time, were for her salary." (PSOF ¶ 50; DSOF ¶ 27; Namm Aff. ¶ 101). Neither BBB nor JMT made regular payments in equal amounts to Mrs. Namm. (PSOF ¶ 50; DSOF ¶ 27). The Namms' personal 2015 tax return shows gross income of $47,846, and Mr. Namm testified that he makes about $40,000 per year. (PSOF ¶ 52; DSOF ¶ 29). The Namms paid no self-employment tax for 2015, and did not attach Schedule SE for reporting self-employment income to their 2015 tax return. (PSOF ¶ 54; DSOF ¶ 31). Mr. Namm testified that he does not know why none of the monies received from BBB, Deluxe, or JMT are shown on the Namms' 2015 tax return. (PSOF ¶ 53; DSOF ¶ 30).

### g.  *BBB's Insolvency*

Plaintiff's expert prepared a report ("Report"), which reconstructed the monthly end balance sheets for BBB from March 27, 2015 through June 30, 2016. (PSOF ¶ 58; Report, DE 75-31). The Report calculated BBB's assets based on the cash in its bank accounts, the billing reports to its primary customers, Costco and Walmart, the assumption that BBB had 45 days of inventory at an average cost of 45% of related sales, and its 2015 federal tax return showing that it had no fixed assets. (Report at 3). The Report calculated BBB's liabilities based on the billing statements from its manufacturer and the debt owed to Plaintiff under the Notes and, subsequently, the Judgment. (Report at 4). The Report concluded that BBB was insolvent from

---

[5] Mrs. Namm cites to her affidavit, which states the same conclusion without providing any supporting evidence. (DSOF ¶ 24).

March 27, 2015 through June 30, 2016 because its liabilities exceeded its assets each month, by amounts ranging from $133,783 to $239,957. (PSOF ¶ 58).

Mrs. Namm denies that BBB was insolvent. (DSOF ¶ 32). She states that the expert should not have included the full amount due on Plaintiff's debt each month. (DSOF ¶ 32). She also states that she "believe[s] the Recipes have a significant value today, which exceeds Plaintiff's debt." (Namm Aff. ¶¶ 13, 105). As evidence of the value of her Recipes, Mrs. Namm points to the Asset Purchase Agreement, under which Plaintiff paid $300,000 "for 49% of the assets of Deluxe, the biggest asset of Deluxe being the Recipes." (Namm Aff. ¶ 8). Finally, Mrs. Namm asserts that "but for Plaintiff's intentional interference with [BBB's] customers . . . [BBB] was making money." (DSOF ¶ 32).

### h.   Dissolution of BBB

On June 3, 2016, less than three weeks after the Judgment, Mrs. Namm filed Articles of Dissolution for BBB, and on June 13, 2016, she filed a Dissociation or Resignation of Member, Manager. (PSOF ¶¶ 20, 22; DSOF ¶ 8). After filing the Articles of Dissolution, Mrs. Namm continued to sell BBB's products and deposit the revenue into Deluxe's bank account no. 6618, although Mrs. Namm states that these transactions were part of the winding down of BBB and that the last check cleared on June 26, 2016 for an invoice mailed on May 15, 2016. (PSOF ¶ 23; DSOF ¶ 9).

### i.   The instant action

On October 26, 2016, Plaintiff filed the instant action. (DE 1). On November 2, 2016, Plaintiff filed an Amended Complaint ("Complaint"), alleging: (1) violation of Fla. Stat. § 726.105(1)(a) of the Florida Uniform Fraudulent Transfer Act ("FUFTA") against Mrs. and Mr. Namm ("Count I"); (2) violation of Fla. Stat. § 726.105(1)(b) of FUFTA against Mrs. and Mr.

7

Namm ("Count II"); (3) violation of Fla. Stat. § 726.106(1) of FUFTA against Mrs. and Mr. Namm ("Count III"); (4) violation of Fla. Stat. § 726.106(2) of FUFTA against Mrs. and Mr. Namm ("Count IV"); (5) breach of fiduciary duty under Florida common law against Mrs. Namm ("Count V"); (6) successor liability against Deluxe ("Count VI"); and (7) entitlement to declaratory relief under 28 U.S.C. § 2201 that Mrs. Namm and Deluxe are the alter egos of BBB ("Count VII"). (Complaint, DE 20).

## II.    Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant." *Ellis v. England*, 432 F.3d 1321, 1325-26 (11th Cir. 2005). "For factual issues to be considered genuine, they must have a real basis in the record." *Id.* at 1326 (internal citation omitted). "For instance, mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Id.* (internal citation omitted). "Moreover, statements in affidavits that are based, in part, upon information and belief, cannot raise genuine issues of fact, and thus also cannot defeat a motion for summary judgment." *Id.* (internal citations omitted).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)(1)(A)). When the moving party bears the burden of proof at trial, "the moving party must show that, on all the essential elements of its case on

which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (internal citation omitted). "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.* (internal quotations and citations omitted).

## III.   Discussion

First, I address Deluxe and Mrs. Namm's joint liability for BBB's debt to Plaintiff under Counts VI and VII, respectively. Next, I address Mrs. Namm's liability for breach of fiduciary duty under Count V. Last, I address Mr. and Mrs. Namm's liability for fraudulent transfers under Counts I, II, and III.

### A. Count VI: Successor Liability

Under Count VI, Plaintiff seeks to hold Deluxe jointly liable for the Judgment against BBB, in the amount of $233,593.59 as of April 17, 2017, under a theory of successor liability.[6]

---

[6] Plaintiff cites no cases, and the Court is unaware of any, for the proposition that successor liability is an independent cause of action. *See, e.g., Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1237 (11th Cir. 2005) (noting that successor liability is an equitable doctrine, and applying it to a cause of action under the Uniformed Services Employment and Reemployment Rights Act of 1994); *Tindall v. H & S Homes, LLC*, No. 5:10-CV-044 CAR, 2011 WL 4345189, at *3 (M.D. Ga. 2011) ("[T]he theory of successor liability merely provides a plaintiff an alternative entity from whom to recover; it does not create a new cause of action against the successor which is independent of the underlying tort."); *In re Fairchild Aircraft Corp.,* 184 B.R. 910, 920 (Bankr. W.D. Tex. 1995) ("[S]uccessor liability does not create a new cause of action against the purchaser so much as it transfers the liability of the predecessor to the purchaser.") (emphasis removed), *vacated on other grounds,* 220 B.R. 909 (Bankr. W.D. Tex. 1998). However, courts permit an action for declaratory judgment on the issue of successor liability. *See, e.g., Tindall,* No. 5:10-CV-044 CAR, 2011 WL 4345189, at *4; *In re Fundamental Long Term Care, Inc.*, 507 B.R. 359, 371 (Bankr. M.D. Fla. 2014). The Complaint sufficiently alleges a cause of action for declaratory relief on the issue of successor liability.

Florida honors "the 'traditional corporate law rule' which does not automatically impose the liabilities of a predecessor corporation upon a successor corporation unless:

> (1) the successor expressly or impliedly assumes obligations of the predecessor,
>
> (2) the transaction is a de facto merger,
>
> (3) the successor is a mere continuation of the predecessor, or
>
> (4) the transaction is a fraudulent effort to avoid the liabilities of the predecessor."[7]

*Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145, 151 (Fla. 4th DCA 1994) (citing *Bernard v. Kee Mfg. Co.*, 409 So. 2d 1047, 1049 (Fla. 1982)); *see also Centimark Corp. v. A to Z Coatings & Sons, Inc.*, 288 F. App'x 610, 614 (11th Cir. 2008). Plaintiff argues that Deluxe is liable for BBB's debt because BBB and Deluxe engaged in a de facto merger or because Deluxe is a mere continuation of BBB.[8]

"The concept of continuation of business arises where the successor corporation is merely a continuation or reincarnation of the predecessor corporation under a different name." *Munim*, 648 So. 2d 145 at 154 (citing *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir.) (en banc), *reh'g denied*, 765 F.2d 154 (1985)). "[C]ontinuity of the selling corporation [is] evidenced by such things as the same management, personnel, assets, location and stockholders."[9] *Id.* (quoting *300 Pine Island Assoc. v. Steven L. Cohen & Assoc.*, 547 So. 2d 255, 256 (Fla. 4th DCA 1989)); *see also Centimark Corp.*, 288 F. App'x at 615 (holding that the

---

[7] Under Florida law, "[c]laims involving 'internal affairs' of corporations . . . are subject to the laws of the state of incorporation." *Chatlos Found., Inc. v. D'Arata*, 882 So. 2d 1021, 1023 (Fla. 5th DCA 2004) (quoting *Davis & Cox v. Summa Corp.*, 751 F.2d 1507 (9th Cir. 1985)). Because BBB is a Florida limited liability company, and the issue of successor liability deals with its internal affairs, the Court applies Florida law. In addition, Defendants do not dispute that Florida law applies.

[8] Because I find that Deluxe is a mere continuation of BBB, I need not determine whether a de facto merger occurred.

[9] "Although [*300 Pine Island* used] the words 'de facto merger' . . . , clearly the standard being applied was primarily that of 'mere continuation of business.'" *Munim*, 648 So. 2d 145 at 154.

"evidence establishes that A to Z Georgia and A to Z Florida had great overlap in their officers, directors, personnel, assets, and stockholders, and accordingly, defendants have not shown that the court erred in finding A to Z Florida liable to [plaintiff] as a mere continuation of A to Z Georgia"). "The key element of a continuation is a common identity of the officers, directors and stockholders in the selling and purchasing corporation." *Id.* "Proof of fraudulent intent is not an integral element." *Munim*, 648 So. 2d at 153.

In *Munim*, the Fourth District Court of Appeals affirmed summary judgment on successor liability where a successor entity "provided the same [] services in the same office with the same files, patients, nurses, clerical help, office manager and the same major player, Dr. Munim – the sole stockholder in and president of each P.A." *Id.* at 154-55. Dr. Azar, an employee at Dr. Munim's medical practice, Munim P.A., obtained a judgment against Munim P.A. for breach of employment contract, for which he sought to hold Munim P.A's successor, Pulmonary Associates, liable. *Id.* at 149. The court found that Pulmonary Associates was liable for Munim P.A.'s debt as a mere continuation of Munim P.A. where (1) Dr. Munim incorporated Pulmonary Associates 12 days after judgment was entered against Munim P.A., (2) six weeks after the judgment, Munim P.A. ceased seeing patients and Pulmonary Associates began seeing those same patients, (3) Pulmonary Associates offered the same services as Munim P.A, (4) Dr. Munim was sole shareholder, president, and manager of day-to-day operations of both entities, and (5) Pulmonary Associates had the same equipment and staff as Munim P.A. *Id.* at 150-151. The court found that Dr. Munim's affidavit, stating that he misspoke when he testified that Munim P.A. was no longer in business, was unsubstantiated by any evidence and did not raise a genuine issue of material fact. *Id.* at 151.

Here, the undisputed facts show that Mrs. Namm operated Deluxe as a mere continuation of BBB. Mrs. Namm was the sole member, in charge of day-to-day operations, for BBB and Deluxe. BBB and Deluxe operated out of the same location. (Answer, DE 29 ¶ 2). Mrs. Namm testified that they shared the same customers, manufacturers, and freight companies. (Namm Dep., 24:1-24, 32:10-16, 43:7-12). They sold the same products. (Namm Dep., 21:21-22:10). Indeed, although Deluxe sold the Pasta Business to BBB in 2012, Mrs. Namm testified that she opened bank accounts for Deluxe in 2014, and deposited $307,363.83 in revenue from the Pasta Business into them from February 24, 2015, immediately before the Settlement, through October 5, 2016. (Namm Dep., 91:5-14). Mrs. Namm explained that customers made their checks payable to Deluxe, that she wanted to avoid Plaintiff's efforts to garnish BBB's accounts,[10] and that "[i]t was all still the same at the end of the day" because BBB and Deluxe were "one in the same." (Namm Dep., 91:5-14, 94:19-95:2). On June 3, 2016, less than three weeks after the Judgment, Mrs. Namm filed Articles of Dissolution for BBB. After filing the Articles of Dissolution, Mrs. Namm continued to deposit revenue from the Pasta Business into Deluxe's bank accounts.[11]

In opposition, Mrs. Namm asserts that although BBB and Deluxe at one time shared the same location, customers, manufacturers, freight companies, product, and member-manager, Deluxe was no longer in business after 2012, and therefore cannot be a continuation of BBB. As evidence that Deluxe was in business after 2012, Plaintiff offers undisputed evidence that Mrs.

---

[10] Mrs. Namm now asserts that she was "mistaken" when she testified that she deposited the funds in Deluxe's account to avoid Plaintiff's efforts to collect the debt that BBB owed to Plaintiff. However, even if Mrs. Namm did not use Deluxe's bank account to avoid BBB's creditor, fraudulent intent is not required to impose successor liability under a continuation theory. *See Munim*, 648 So. 2d at 153.

[11] Mrs. Namm asserts that the checks deposited in Deluxe's accounts after she filed Articles of Dissolution for BBB were part of winding down BBB. Mrs. Namm does not explain why BBB's profits would go to Deluxe as part of winding down BBB, rather than to pay of BBB's debts.

Namm opened new bank accounts for Deluxe in 2014, that she deposited $307,363.83 in Pasta Business revenue into the accounts, and that Mrs. Namm testified that Deluxe used Kaltec as a manufacturer from 2012 to 2016.  (Namm Dep., 24:19-20).

Mrs. Namm does not rebut Plaintiff's evidence.  In her affidavit, Mrs. Namm states that Deluxe received profits from Pasta Business revenue because Plaintiff never told customers to make checks payable to BBB, so they continued to make checks payable to Deluxe.[12]  While the Court accepts Mrs. Namm's statement as true as to those checks made payable to Deluxe, it does not explain the multiple checks made payable to BBB, which Mrs. Namm also deposited into Deluxe's bank account.  (DE 75-7; DE 75-8).  Furthermore, Mrs. Namm admits that she opened bank accounts for Deluxe in 2014, and does not address her prior statement that Deluxe continued to use Kaltec as a manufacturer after 2012.  Accordingly, Mrs. Namm affidavit does create a genuine issue of material fact as to whether Deluxe was in business after 2012.

In sum, because the undisputed evidence shows that Deluxe operated as a mere continuation of BBB under a different name, Plaintiff's Motion for Summary Judgment on Count VI is granted.  Plaintiff is entitled to a declaratory judgment that Deluxe is liable for BBB's debt to Plaintiff under the Judgment, which was $233,593.59 as of April 17, 2017.

**B. Count VI: Piercing the Corporate Veil**

Plaintiff seeks a declaratory judgment that Mrs. Namm is liable for BBB's debt to Plaintiff under a theory of piercing the corporate veil.

---

[12] Mrs. Namm admits that she could have contacted these customers and told them to make the checks payable to BBB, but she did not because she "had a lot going on."  (Namm Dep., 95:12-20).

"Under Florida law, the corporate veil will only be pierced to prevent fraud or injustice."[13] *Eckhardt v. United States*, 463 F. App'x 852, 855 (11th Cir. 2012) (citing *Dania Jai-Alai Palace, Inc. v. Sykes,* 450 So.2d 1114, 1121 (Fla. 1984)).  "To pierce the corporate veil in Florida, a claimant must establish:

> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence was in fact non-existent and the shareholders were in fact alter egos of the corporation;
>
> (2) the corporate form must have been used fraudulently or for an improper purpose; and
>
> (3) the fraudulent or improper use of the corporate form caused injury to the claimant."[14]

*Id.* at 855-56 (citing *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008)).  The issue is fact-specific, but may be decided on summary judgment.  *Id.* at 856 (citing *Miller v. Harco Nat'l Ins. Co.*, 241 F.3d 1331, 1332-33 (11th Cir. 2001)).

### *i.  Domination and Control*

"One important factor relevant to whether an individual dominates the corporation to such an extent as to negate its separate identity is whether corporate funds were used for the individual's benefit."  *Id.* (citing *Dania Jai-Alai Palace*, 450 So. 2d at 1120); *see also Walton v. Tomax Corp.*, 632 So. 2d 178, 180 (Fla. 5th DCA 1994) (finding corporate officer dominated corporation where he "depleted corporate assets for the personal benefits of himself and his family").

---

[13] As discussed above, because BBB is a Florida limited liability company and piercing the corporate veil involves its internal affairs, Florida law applies.  *See Chatlos Found.*, 882 So. 2d at 1023.  Defendants do not dispute the application of Florida law.

[14] The veil-piercing doctrine applies to limited liability companies.  *XL Vision, LLC. v. Holloway*, 856 So. 2d 1063, 1066 (Fla. 5th DCA 2003).

In *Eckhardt*, the Eleventh Circuit found the sole owner and president dominated a corporation where he transferred funds from the corporate account for his benefit, including direct transfers to his mortgage company. *Id.* at 856-57. Although the president argued that the transfers were compensation for his services, the court found no evidence that the checks were written for his salary, and noted that he had previously testified that he did not know why he had written himself a check. *Id.* at 857. Nevertheless, even assuming the transfers were for the president's salary, the court found that direct transfers from the corporate account to the president's mortgage company "as a matter of convenience" showed disregard for the corporate form and commingled corporate funds, thereby representing the president's domination and control of the corporation. *Id.*

Here, the undisputed evidence shows that Mrs. Namm, the sole member in charge of day-to-day operations of BBB, made transfers from BBB for her personal benefit and the benefit of her family.[15] These transfers included direct transfers to pay the mortgage on the Namms' personal residence and deposits into the Namms' joint banking accounts for family expenses.

Although Mrs. Namm asserts that some of the transfers were for a loan repayment and compensation for her services to BBB, she offers only a conclusory statement in her affidavit, unsupported by any specific details or other evidence. "To survive summary judgment, opposing affidavits must set forth *specific facts* showing that there is an issue for trial." *Hill v. Oil Dri Corp. of Georgia*, 198 F. App'x 852, 858 (11th Cir. 2006) (*citing* Fed. R. Civ. P. 56(e); *Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000)) (emphasis in original) (holding that a non-movant's conclusory affidavit, lacking in specific facts, is insufficient to create genuine issues of material fact). In her affidavit, Mrs. Namm states that "there is evidence that some of the

---

[15] Mrs. Namm does not dispute that she caused BBB to make the transfers.

transfers, whatever transfers are being referred to by Plaintiff at the time, were for her salary." (Namm Aff. ¶ 101).  While Mrs. Namm identifies specific transfers made for business expenses, albeit without any receipts to support her assertions, she merely concludes that the balance of the transfers was for a $78,689.67 loan and her salary. (DSOF ¶ 23).

In contrast to Mrs. Namm's conclusory affidavit, Plaintiff's evidence shows that no regular payments in equal amounts were made to Mrs. Namm.  (PSOF ¶ 51; DSOF ¶ 28). Furthermore, it is undisputed that the Namms' 2015 personal tax return shows the Namms paid no self-employment tax for 2015, and did not attach Schedule SE for reporting self-employment income to their tax return.  Mr. Namm testified that he does not know why the monies received from BBB are not shown on the Namms' 2015 tax return.  (J. Namm Dep., 14:21-24).   In addition, the Namms' 2015 tax return shows a gross income of $47,846, and Mr. Namm testified that he makes about $40,000 per year.  Finally, there is no evidence documenting a loan, or repayments on the loan.

Furthermore, BBB made direct transfers to third parties, including transfers to pay Mr. Namm's mortgage on the Namms' personal residence.  (PSOF ¶¶ 37-38; DSOF ¶ 16).  These direct transfers show a disregard for the corporate form and commingling of corporate funds, which further establish Mrs. Namm's domination and control of the corporation.  *Id.*

Accordingly, Mrs. Namm's use of corporate funds for her and her family's personal benefit and her comingling of corporate funds show that Mrs. Namm dominated and controlled BBB to such an extent that there was no meaningful difference between Mrs. Namm and the corporate form, BBB.

*ii. Improper or Fraudulent Purpose*

Under the second element, Plaintiff must prove that BBB was formed *or used* for an improper or fraudulent purpose. *Eckhardt*, 463 F. App'x at 857; *Advertects, Inc. v. Sawyer Industries, Inc.*, 84 So. 2d 21, 24 (Fla. 1955) (holding corporate veil may be pierced where the organization was "employed by the stockholders for fraudulent or misleading purposes, or in some fashion that the corporate property was converted or the corporate assets depleted for the personal benefit of the individual stockholders, or that the corporate structure was not bona fidely established or, in general, that property belonging to the corporation can be traced into the hands of the stockholders."). Abuse of the corporate form to defraud creditors, including by making inappropriate distributions at the expense of corporate creditors, constitutes improper use of the corporate entity. *See Walton*, 632 So. 2d at 180-81 (reversing directed verdict where "there was evidence which . . . tended to show that [corporate director] depleted corporate assets for the personal benefit of himself and his family while the corporation was unable to pay its debts"); *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349-50 (11th Cir. 2011) (Because "shareholders incorporate to limit their liability, creating a separate entity that is 'apart from its stockholders' . . . courts will not ignore this separate entity so long as the stockholders make 'proper use' of this fiction; they must not use limited liability to defraud creditors.") (citing *Dania Jai-Alai Palace*, 450 So. 2d at 1119); *Eckhardt*, 463 F. App'x at 857 (finding improper use of corporation to evade employment taxes where president transferred over $100,000 from corporate account to his personal accounts despite corporation's unpaid employment tax liabilities); *cf. Advertects*, 84 So. 2d at 24 (refusing to pierce corporate veil where there was "no showing at all that the stockholders had improperly converted any of its property to their own use or in any fashion fraudulently or inequitably abused their relationship with the corporate entity").

In *Eckhardt*, Mr. Eckhardt formed a new corporation, KCCI, after the IRS filed a notice of tax lien for unpaid taxes against his previous corporation. *Eckhardt*, 463 F. App'x at 854. KCCI subsequently incurred employment tax liabilities, which the IRS tried unsuccessfully to collect. *Id.*  When the government filed a claim to foreclose its federal tax lien against the Eckhardts as alter egos of KCCI, the Eleventh Circuit held that the history of KCCI's formation, combined with evidence of transfers from its corporate account for Mr. Eckhardt's personal benefit, including directly to his mortgage company, established that Mr. Eckhardt employed KCCI for the improper purpose of evading payment of employment taxes. *Id.* at 858.

In *Walton*, the Fifth District Court of Appeals found sufficient evidence of improper use of the corporate form to reverse a directed verdict on piercing the corporate veil. *Walton*, 632 So. 2d at 181.  The evidence showed that the corporate officer continued to operate the corporation for five months after it could no longer pay its debts, during which time he caused it to make improper distributions for his and his family's benefit. *Id.* at 180.  Evidence of improper distributions included: (1) use of corporate funds to pay the officer's personal credit card debt, (2) payments to the officer, allegedly for his salary, but which did not relate to previous payroll checks or include withholding for federal payroll taxes, (3) weekly checks paid to his wife even though she did not provide services to the business, and there was no evidence she had loaned the corporation money, as officer claimed, (4) payments allegedly for business expenses, but unsupported by documentation, (5) transfer of the corporation's proceeds directly into officer's personal account, and (6) unexplained payments to his daughter-in-law and to his son's charities. *Id.* at 179.

Here, the undisputed evidence shows that Mrs. Namm used BBB for the improper purpose of avoiding payment to Plaintiff, BBB's creditor.  First, there is undisputed evidence

that BBB made distributions for the Namms' personal benefit and without consideration.  As discussed in Section III.A., the undisputed evidence shows numerous distributions from BBB's corporate account into the Namms' joint banking accounts for Mrs. Namm's personal benefit, and not for Mrs. Namm's salary or the repayment of a loan.  In addition, BBB made direct payments to mortgage companies on mortgages for which Mr. Namm was solely obligated.  Yet Mr. Namm testified that he provided no consideration in exchange for the benefits that he received. (J. Namm Dep. 12:6-21).  Although Mrs. Namm asserts that Mr. Namm "did assist her from time to time in her work for [BBB]," she offers no specific details or supporting evidence. (DSOF ¶ 24).

Second, the undisputed evidence shows that Mrs. Namm caused BBB to make these transfers despite BBB's insolvency.  Plaintiff's Expert Report reconstructed BBB's monthly end balance sheets,[16] and concluded that BBB's liabilities exceeded its assets each month, by amounts ranging from $133,783 to $239,957, from the date of the Settlement, on March 27, 2015, through the filing of Articles of Dissolution for BBB on June 3, 2016. *See* Fla. Stat. § 726.103(1) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.").  In addition, Mrs. Namm testified that BBB was always behind on payments to its manufacturer.[17]   (Namm Dep., 112:21-24); *see* Fla. Stat. § 607.01401(16) ("'Insolvent' means the inability of a corporation to pay its debts as they become

---

[16] The Report calculated BBB's assets based on the cash in its bank accounts, the billing reports to its primary customers, Costco and Walmart, the assumption that BBB had 45 days of inventory at an average cost of 45% of related sales, and its 2015 federal tax return showing that it had no fixed assets. (Report at 3). The Report calculated BBB's liabilities based on the billing statements from its manufacturer and the debt owed to Plaintiff under the Notes, and, subsequently, the Judgment. (Report at 4).

[17] Although Mrs. Namm admits that BBB was always behind on its payment to its manufacturer, she explains that this was because "payment on their invoice was due 30 days after invoicing." (Namm. Aff. ¶ 106). Mrs. Namm offers no explanation for why 30 days was insufficient time to pay an invoice.

due in the usual course of its business."); Fla. Stat. § 726.103(2) ("A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent.").

Although Mrs. Namm denies that BBB was insolvent, she provides no evidence to support her denial.[18]  She argues that the expert should not have included the full amount due on BBB's debt in calculating BBB's liabilities each month, but she offers no alternative calculations, including any balance sheets that she maintained for BBB.  She also states that she "believe[s] the Recipes have a significant value today, which exceeds Plaintiff's debt," but does not state what that value is.  (Namm Aff. ¶¶ 13, 105); *see* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  She suggests that the Recipes may be worth around $300,000 because Plaintiff paid $300,000 under the Asset Purchase Agreement in 2012 "for 49% of the assets of Deluxe."  (Namm Aff. ¶ 8).  Yet, she acknowledges that Plaintiff's payment was for all Deluxe's assets, and she offers no support for her assertion that "the biggest asset of Deluxe" was the Recipes or that the value of the Recipes is the same today as it was in 2012.  (Namm Aff. ¶ 8).

Finally, even if BBB was not insolvent, there is direct evidence that Mrs. Namm used the corporate form to avoid creditors.  After Mrs. Namm filed BBB's Articles of Dissolution, she continued to transfer BBB's proceeds into Deluxe's bank account instead of retaining the proceeds for BBB to pay its creditors.

---

[18] Mrs. Namm asserts that but for Plaintiff's intentional interference with BBB's customers, BBB was "making money."  (DSOF ¶ 32).  Mrs. Namm states that Plaintiff notified BBB's customers of BBB's debt to Plaintiff and requested that they make payments directly to Plaintiff.  However, this does not create a genuine issue of material fact as to BBB's insolvency.  (Namm Aff. ¶¶ 65-77).

Defendants argue that Plaintiff did not have Mrs. Namm sign a personal guarantee for the Notes, despite Plaintiff's knowledge of BBB's financial condition, and therefore Plaintiff cannot now seek to hold Mrs. Namm liable. However, Plaintiff was entitled to rely on BBB's promise to repay its debt and is not required to prove that Mrs. Namm misled it regarding BBB's financial condition. *See USP Real Estate Inv. Trust v. Disc. Auto Parts, Inc.*, 570 So. 2d 386, 393 (Fla. 1st DCA 1990) (holding plaintiff was not required to prove that corporation made fraudulent representations regarding its financial condition to pierce corporate veil and was entitled to rely on terms of agreement).

In sum, the undisputed evidence shows that Mrs. Namm improperly used the corporate form to avoid creditors by depleting corporate assets during BBB's insolvency, and after its dissolution, for the personal benefit of herself and her family in order to avoid BBB's creditor.

### iii.   *Injury to Plaintiff*

Improper use of the corporate form causes injury to corporate creditors when it prevents the collection of outstanding debts. *Walton*, 632 So. 2d at 180; *Eckhardt*, 463 F. App'x at 858. Because it is undisputed that Plaintiff has been unable to collect its debt, Plaintiff has shown injury. *See Eckhardt*, 463 F. App'x at 858 (holding creditor's inability to collect from corporation proved injury from improper distributions).

Accordingly, Plaintiff's Motion for Summary Judgment against Mrs. Namm on Count VII is granted.[19]  Plaintiff is entitled to a declaratory judgment that Mrs. Namm is liable for BBB's debt to Plaintiff under the Judgment, which was $233,593.59 as of April 17, 2017.

---

[19] Although the Complaint also alleges that Deluxe is liable as BBB's alter ego under Count VII, Plaintiff does not move for summary judgment on these grounds.

## C.  Count V: Breach of Fiduciary Duties

Under Count V, Plaintiff seeks to recover $243,248.08 in funds that Mrs. Namm caused

BBB to transfer, allegedly in breach of her fiduciary duty to Plaintiff as a creditor of BBB.

"The elements of a claim for breach of fiduciary duty are: the existence of a fiduciary

duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages."

*Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002).[20]

Defendants argue that directors and officers do not owe corporate creditors a fiduciary

duty under Florida law.   Plaintiff cites several Florida bankruptcy court opinions for the

proposition that a fiduciary duty to creditors arises upon a corporate entity's insolvency.  *See In*

*re Trafford Distrib. Ctr., Inc.*, 431 B.R. 263, 290 (Bankr. S.D. Fla. 2010); *In re Aqua Clear*

*Techs., Inc.*, 361 B.R. 567, 575 (Bankr. S.D. Fla. 2007); *In re SOL, LLC*, No. 09-12684-BKC-

AJC, 2012 WL 2673254, at *16 (Bankr. S.D. Fla. July 5, 2012).  The Delaware Supreme Court,

on which Florida courts rely in construing Florida corporate law,[21] clarified that directors of an

insolvent corporation do not owe direct fiduciary duties to creditors:

> Recognizing that directors of an insolvent corporation owe direct fiduciary duties
> to creditors, would create uncertainty for directors who have a fiduciary duty to
> exercise their business judgment in the best interest of the insolvent corporation.
> To recognize a new right for creditors to bring direct fiduciary claims against
> those directors would create a conflict between those directors' duty to maximize
> the value of the insolvent corporation for the benefit of all those having an interest
> in it, and the newly recognized direct fiduciary duty to individual creditors.
> Directors of insolvent corporations must retain the freedom to engage in vigorous,
> good faith negotiations with individual creditors for the benefit of the corporation.
> Accordingly, we hold that individual *creditors* of an *insolvent* corporation have *no*
> *right to assert direct* claims for breach of fiduciary duty against corporate
> directors.

---

[20] Because BBB is a Florida limited liability company and breach of fiduciary duty involves its
internal affairs, Florida law applies.  *See Chatlos Found.*, 882 So. 2d at 1023.  Defendants do not
dispute the application of Florida law.
[21] *Connolly v. Agostino's Ristorante, Inc.*, 775 So. 2d 387, 388 (Fla. 2d DCA 2000); *Int'l Ins. Co.*
*v. Johns*, 874 F.2d 1447, 1459 n.22 (11th Cir. 1989).

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007)

(emphasis in original).  The Florida bankruptcy court opinions, cited by Plaintiff, rely on *Geyer*

*v. Ingersoll Publications Co.*, 621 A.2d 784, 787-88 (Del. Ch. 1992).[22]  Although *Geyer*

suggested that a fiduciary duty to creditors may arise upon corporate insolvency, the subsequent

*Gheewalla* opinion clarified that it does not.  *See Mukamal v. Bakes*, 378 F. App'x 890, 898

(11th Cir. 2010) (explaining that *Geyer* suggested a fiduciary duty to creditors may arise upon

insolvency, but *Gheewalla* clarified otherwise).

Although creditors have no right to assert direct claims for breach of fiduciary duty,

"[c]reditors may nonetheless protect their interest by bringing derivative claims on behalf of the

insolvent corporation or any *other* direct nonfiduciary claim . . . that may be available for

individual creditors." *Gheewalla*, 930 A.2d at 103 (emphasis in original).  Here, Plaintiff does

not purport to assert a derivative claim for relief.[23]  Rather, Plaintiff argues that "Mrs. Namm

---

[22] For the proposition that there is a direct fiduciary duty to creditors, *In re Trafford Distrib. Ctr., Inc.*, 431 B.R. 263, 290 (Bankr. S.D. Fla. 2010) cites *In re Toy King Distributors, Inc.*, 256 B.R. 1, 167 (Bankr. M.D. Fla. 2000), which cites *In re Aqua Clear Techs., Inc.*, 361 B.R. 567, 575 (Bankr. S.D. Fla. 2007), which cites *Geyer*.  The other bankruptcy court case cited by Plaintiff, *In re SOL, LLC*, No. 09-12684-BKC-AJC, 2012 WL 2673254, at *16 (Bankr. S.D. Fla. July 5, 2012), cites no authority for this proposition.  I was able to find one Florida state court case that states there is a direct duty, *Connolly v. Agostino's Ristorante, Inc.*, 775 So. 2d 387, 388 (Fla. 2d DCA 2000), but this case also relies on *Geyer*.  While *Guar. Trust & Sav. Bank v. U.S. Trust Co.*, 103 So. 620, 622 (Fla. 1925) and *Poe & Assocs., Inc. v. Emberton*, 438 So. 2d 1082, 1084 (Fla. 2d DCA 1983) address directors' duties to creditors upon insolvency, they both arise in the context of prohibiting preferential payment of debts owed to directors over debts owed to creditors.  Thus, to the extent *Guaranty Trust* and *Poe* permit a creditor cause of action for breach of fiduciary duty, despite Delaware law to the contrary, they do so only to the extent of the creditor's claim against the corporation.  Because I find that Mrs. Namm is liable for the full amount of the debt that BBB owes to Plaintiff under a theory of piercing the corporate veil, I need not determine whether Plaintiff could also recover that same amount under a theory of breach of fiduciary duty.

[23] "[T]he current Florida doctrine explaining which actions should be maintained directly and which must be brought derivatively is incredibly opaque." *Dinuro Investments, LLC v. Camacho*, 141 So. 3d 731, 739 (Fla. 3d DCA 2014).  The Third District Court of Appeals

breached her duty of care and duty of loyalty to TTT Foods as a creditor of [BBB] by causing the

Transfers to occur." (DE 74 at 14). Accordingly, Plaintiff's Motion for Summary Judgment on

Count V is denied.

### D. Counts I, II, III: Fraudulent Transfers

Plaintiff seeks to recover $221,260 against Mrs. Namm and Mr. Namm, jointly and

severally, for the alleged fraudulent transfers that Mrs. Namm caused BBB and Deluxe to make

to or for the benefit of Mrs. and Mr. Namm.[24]

Under FUFTA,

the creditor may recover judgment for the value of the asset transferred . . . or the
amount necessary to satisfy the creditor's claim, whichever is less. The judgment
may be entered against:

(a) The first transferee of the asset or the person for whose benefit the
transfer was made; or

---

recently adopted the following test: "an action may be brought directly only if (1) there is a
direct harm to the shareholder or member such that the alleged injury does not flow subsequently
from an initial harm to the company *and* (2) there is a special injury to the shareholder or
member that is separate and distinct from those sustained by the other shareholders or members."
*Id.* at 739-40 (citations omitted) (emphasis in original). However, "[a] shareholder or member
need not satisfy this two-prong test when there is a separate duty owed by the defendant(s) to the
individual plaintiff under contractual or statutory mandates." *Id.* at 740. The Delaware Supreme
Court, which *In re TOUSA, Inc.*, 437 B.R. 447, 457 (Bankr. S.D. Fla. 2010) followed in
interpreting Florida law on when a suit is direct versus derivative, set forth the following test:
"[t]he analysis [for distinguishing between direct and derivative actions] must be based solely on
the following questions: Who suffered the alleged harm – the corporation or the suing
stockholder individually – and who would receive the benefit of the recovery or other remedy?"
*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004). "Because a
derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the
corporation." *Id.* at 1036. However, the Florida Fourth District Court of Appeals has declined to
adopt this test. *Karten v. Woltin*, 23 So. 3d 839, 841 (Fla. 4th DCA 2009).

[24] Because I have already found Mrs. Namm liable for the full amount of the debt BBB owes
Plaintiff, which exceeds the amount of the fraudulent transfers, I need not address Plaintiff's
alternate theory to recover this amount from Mrs. Namm under Counts I, II, and III. I need only
address the extent to which Mr. Namm is jointly liable with Mrs. Namm for BBB's debt based
on the amount of fraudulent transfers, if any, made for his benefit.

(b) Any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

Fla. Stat. § 726.109(2). "A transfer or obligation is not voidable under s. 726.105(1)(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." Fla. Stat. § 726.109(1).

To prove a fraudulent transfer under FUFTA, the creditor must demonstrate that "(1) there was a creditor to be defrauded; (2) a debtor intending fraud; and (3) a conveyance of property which could have been applicable to the payment of the debt due." *Nationsbank, N.A. v. Coastal Utils., Inc.*, 814 So. 2d 1227, 1229 (Fla. 4th DCA 2002).

"A 'creditor' is 'a person who has a claim,' and 'claim' is broadly defined as 'a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.'" *Wiand v. Lee*, 753 F.3d 1194, 1200 (11th Cir. 2014) (citing Fla. Stat. §§ 726.102(3), (4)). "[A] conveyance of property which could have been applicable to the payment of the debt due" occurs when a debtor "divert[s] property that he control[s] and that could have been applicable to the debt due." *Id.* It is undisputed that BBB owed Plaintiff $170,000.01 under the Notes executed as part of the Settlement on March 27, 2015. It is also undisputed that BBB owed Plaintiff $176,001.76, plus 4.75% interest, as of April 18, 2016, and an additional $47,178.68 in attorney's fees, plus 4.78% interest, as of May 16, 2016, under the Judgment. As of April 17, 2017, BBB has not paid Plaintiff any of the Judgment. Accordingly, the undisputed facts show that Plaintiff is a creditor, BBB is a debtor, and any diversion of funds up to the amount of the Judgment could have been applicable to the debt due.

FUFTA creates a cause of action for both actual and constructive fraud.[25]  *See Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145, 152 (Fla. 4th DCA 1994).  Section 726.105(1)(a), FUFTA's actual fraud provision, states that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation[] [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."  Fla. Stat. § 726.105(1)(a).  Under § 726.106(1), FUFTA's constructive fraud provision, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."  Fla. Stat. § 726.106.  "Under the [F]UFTA, a debtor is 'insolvent' if the sum of his debts is greater than his assets at a fair evaluation, section 726.103(1), Florida Statutes (1993), or a debtor is presumed insolvent if generally not paying his debts as they become due, *id.* at section 726.103(2)."  *Munim*, 648 So. 2d at 153.

"In determining whether a transfer was made with actual intent to defraud a creditor, courts look to the statutory 'badges of fraud,'" identified in Fla. Stat. § 726.105(2)(a)-(k).  *Wiand*, 753 F.3d at 1200.  Section 726.105(2)(a)-(k) lists the following badges of fraud:

> (a) The transfer or obligation was to an insider.
>
> (b) The debtor retained possession or control of the property transferred after the transfer.
>
> (c) The transfer or obligation was disclosed or concealed.

---

[25] Count I asserts a claim under FUFTA's actual fraud provision.  Counts II and III seek the same funds under a theory of constructive fraud.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Fla. Stat. § 726.105(2)(a)-(k).

"The existence of badges of fraud creates a prima facie case and raises a rebuttable presumption that the transaction is void."[26] *In re Bifani*, 580 F. App'x 740, 745 (11th Cir. 2014) (citing *Gen. Elec. Co. v. Chuly Int'l, LLC,* 118 So. 3d 325, 327 (Fla. 3d DCA 2013)). "While a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance[,] several of them when considered together may afford a basis to infer fraud." *Wiand*, 753 F.3d at 1200 (citing *Johnson v. Dowell,* 592 So. 2d 1194, 1197 (Fla. 2d DCA 1992) (internal quotations omitted)); *see also In re Bifani*, 580 F. App'x at 746. For example, in *In re Bifani*, the Eleventh Circuit affirmed summary judgment in favor of a creditor because four badges of fraud established a presumption of actual intent to defraud, which the debtor did not rebut. 580 F. App'x 740, 746 (11th Cir. 2014). The debtor (1)

---

[26] Alternatively, evidence of actual fraudulent intent establishes an unrebuttable claim. *Amjad Munim*, 648 So. 2d at 153.

transferred property to a close friend, or "insider," (2) after a lawsuit had been filed against him, (3) which property the debtor continued to use, and (4) for which he received no reasonably equivalent value in exchange. *Id.* at 745-56. The debtor argued that the transfer was to repay a loan made by the transferee, but the court rejected the debtor's argument as unsupported by any evidence. *Id.* at 746. Rather, the evidence showed that the debtor rarely made payments on the loan owed to the transferee, that neither debtor nor transferee kept track of the payments made, that the transferee never demanded payment for the loans or found the debtor in default, and that after the transfer, the transferee claimed that the entire loan was outstanding in bankruptcy court. *Id.* at 746-77.

### i. Transfers from BBB for the benefit of Mr. Namm

Plaintiff asserts that BBB transferred $102,522.44 to or for the benefit of Mr. and Mrs. Namm after BBB incurred a $170,000.01 debt to Plaintiff under the Settlement.

It is undisputed that the followings transfers, in the amount of $39,417.48, benefited Mr. Namm, (DE 75-21; DE 75-23):[27]

(1) $10,570 transferred from BBB to the Namms' Bank of America joint checking account no. 2389 and TD Bank joint savings account no. 3496 by BBB (PSOF ¶ 48; DSOF ¶ 25);

(2) $20,137.15 transferred from BBB directly to the Ocwen and Freedom Mortgage companies to pay the mortgage on the Namms' personal residence, for which Mr. Namm was the sole owner of the residence and personally obligated on the mortgages (PSOF ¶¶ 37, 38; DSOF ¶ 16); and

---

[27] Defendants dispute that the other transfers were for the benefit of Mrs. and Mr. Namm. (PSOF ¶ 35; DSOF ¶ 14).

(3) $11,077.30 transferred from BBB directly to Toyota and Progressive Insurance for Mr. Namm's vehicle (PSOF ¶ 39; DSOF ¶ 16).[28]

For these transfers, fraudulent intent may be presumed from the evidence of numerous badges of fraud. First, the transfers occurred shortly after BBB incurred a substantial debt under the Notes. Second, many of the transfers were made after Plaintiff brought suit against BBB on June 3, 2015 to recover the debt owed under the Notes. Third, BBB was insolvent, starting in March 2015, as discussed in Section III.B.ii. Fourth, BBB did not receive, in exchange for the transfers, value from Mr. Namm that is reasonably equivalent to $39,417.48, as discussed in Section III.B.ii. Finally, there is evidence that BBB attempted to conceal the transfers when Mrs. Namm, as BBB's representative, swore, in response to an interrogatory in aid of execution of the Judgment, that BBB had not sold or transferred personal property in the last four years.

To rebut the presumption of fraud, Defendants assert that the transfers represent business expenses, repayment for a loan from Mrs. Namm to BBB, and Mrs. Namm's salary. First, as stated above, I have deducted the amount of BBB's business expenses from the transfers made to Mr. Namm. Second, for the reasons discussed in Section III.B.ii, there is no evidence that any of the transfers were to compensate Mrs. Namm or for repayment of a loan. Accordingly, because Defendants have not offered evidence to rebut the presumption of fraud, the Court finds that Mr. Namm is liable for $39,417.48 in fraudulent transfers from BBB that could otherwise have been applied to payment of the debt due to Plaintiff.

---

[28] Plaintiff asserts that $2,366.97 of the transfers to Toyota and Progressive were business expenses for use of the vehicle as a business vehicle, and accordingly, I have deducted this amount. (DE 78-3; DE 78-4).

ii.    *Transfers from Deluxe for the benefit of Mr. Namm*

Plaintiff also seeks $118,737.56 against Mr. and Mrs. Namm, jointly and severally, for transfers from Deluxe for their benefit.  Plaintiff asserts two theories.

First, Plaintiff asserts that Deluxe's transfers for Mr. Namm were fraudulent because Deluxe is a "debtor" to Plaintiff under successor liability.  However, the Parties have not briefed whether successor liability applies retroactively such that Deluxe may be considered Plaintiff's debtor when the transfers were made.  Regardless, Plaintiff has not met its burden of establishing actual or constructive fraud.  Plaintiff provides no evidence that Deluxe was insolvent, had recently incurred a substantial debt, was the subject of a recent lawsuit, or that Mrs. Namm attempted to conceal Deluxe's transfers.  *See* Fla. Stat. §§ 726.105(1)(a), 726.106(1).  Nor does Plaintiff provide evidence that Deluxe was engaged in a business for which its assets were unreasonably small, or for which it intended to incur debts beyond its ability to pay.  *See* Fla. Stat. §§ 726.105(1)(b).

Alternatively, Plaintiff asserts that Mrs. Namm fraudulently deposited BBB's funds into Deluxe's account, and these funds can be traced to Mr. Namm.  However, Plaintiff has not offered sufficient evidence for the Court to trace BBB's profits to the transfers made to Mr. Namm.[29]  *See In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 708 (11th Cir. 2005) (tracing funds in claims brought under federal law and FUFTA).  For example, the Statement of Facts does not indicate whether, and on what dates, Deluxe received funds from other sources besides BBB.  Accordingly, there is insufficient evidence for the Court to determine that Plaintiff is entitled to

---

[29] The Parties have also not briefed the proper method of tracing that the Court should apply under FUFTA.  *Cf. In re Palisades at W. Paces Imaging Ctr., LLC*, 501 B.R. 896, 917 (Bankr. N.D. Ga. 2013) (collecting cases applying different methods of tracing).

judgment against Mr. Namm in the amount of the transfers allegedly made by Deluxe for his benefit.

In sum, Plaintiff's Motion for Summary Judgment on Count I is granted in part and denied in part. Mr. Namm is jointly liable for the Judgment in the amount of $39,417.48.[30] Plaintiff's Motion for Summary Judgment is denied on Counts I, II, and III as to the transfers from Deluxe. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that

(1) Plaintiff's Motion (DE 74) is **GRANTED IN PART AND DENIED IN PART.** Plaintiff is entitled to summary judgment as to Counts VI and VII, and to partial summary judgment as to Count I. Deluxe and Mrs. Namm are jointly liable with BBB for the entire Judgment, in the amount of $233,593.59 as of April 17, 2017, and Mr. Namm is jointly liable with Deluxe, Mrs. Namm, and BBB up to $39,417.48.

(2) This case will proceed to trial as to Counts I, II, III, and IV.

**DONE AND ORDERED** in Chambers in West Palm Beach, Florida, this ___ day of May, 2017.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:        Counsel of Record

---

[30] Because I found Mr. Namm liable under Count I for BBB's transfers, I need not address Plaintiff's alternate theories of liability under Counts II and III.